**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MAX A. CATHCART, | ) |
| | ) |
| Plaintiff, | )    3:08-cv-00266 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, COMMISSIONER | ) |
| OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

I.      **Introduction**

Pending before the court are cross-motions for summary judgment based on the administrative record: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 9) and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 7). The motions have been fully briefed and are ripe for resolution.

Plaintiff, Max A. Cathcart, brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which partially denied his application for disability insurance benefits ("DIB") under title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.

II.     **Background**

A.      **Facts**

Plaintiff was born on January 12, 1960, and was 44 years old at the alleged onset date, which means that at the time, he was defined as a "younger individual" pursuant to 20 C.F.R.

§416.963. (R. 84). Plaintiff did not complete high school, but obtained a GED. (R. 93). Plaintiff's relevant work history was as a concrete worker, a concrete laborer, and as a leather worker. (R. 88).

Plaintiff alleges disability as of June 30, 2004 due to L3 and L4 compression fractures, a pinched sciatic nerve and stenosis. (R. 87). On June 30, 2004, Plaintiff was life-flighted from his place of work after a stack of panels fell on top of him. (R. 57-58, 225). At admission, Plaintiff was diagnosed with a L3 and L4 fracture with spinal stenosis pursuant to testing at the hospital and was placed in a Thoraco-Lumbo-Sacral-Orthosis (TLSO) Brace for three months. (R. 190-191, 200, 206, 210-211, 214-215, 240). During his hospital stay, Plaintiff was examined by Dr. James Burke, a neurologist. Upon neurological examination, Plaintiff was alert and oriented times three with clear and fluent speech, cranial nerves within normal limits, 5/5 strength in the upper and lower extremities, normal and symmetric reflexes, and downward toes bilaterally. (R. 351). X-rays revealed mild compression deformities at the L3 and L4 bodies with no canal compromise. (R. 351). He was placed on Percocet and Zanaflex and was discharged on July 2, 2004. (R. 190-191, 200, 206, 210-211, 214-215, 240).

On July 20, 2004, Plaintiff was examined during a neurological follow-up with Dr. Burke. Plaintiff reported central low-back pain that was worse with walking. He also reported that the TLSO brace was helping. (R. 347). Upon neurological examination, Plaintiff was alert and oriented times three with clear and fluent speech, cranial nerves within normal limits, 5/5 strength in the upper and lower extremities, normal and symmetric reflexes, and downward toes bilaterally. (R. 348). Mild paraspinal lumbar muscle spasms were noted. Dr. Burke reviewed a recent x-ray suggesting no further compression of the L3 and L4 fractures and stable alignment. Dr. Burke

recommended continuing to wear the brace and bone growth stimulator, but told Plaintiff he could drive short distances. (R. 229-230, 348).

Plaintiff was examined again by Dr. Burke in August with complaints of central low back pain with radiation into the hips bilaterally when ambulating and left anterior thigh pain. He reported a continuation of his daily walking and was wearing the TLSO brace. Upon neurological examination, Plaintiff was alert and oriented times three with clear and fluent speech, cranial nerves within normal limits, 5/5 strength in the upper and lower extremities, normal and symmetric reflexes, and downward toes bilaterally. (R. 349). Dr. Burke recommended continuation of brace and bone growth stimulator use. He suggested that Plaintiff could drive short distances. (R. 350).

On September 13, 2004, Plaintiff began seeing and was adjusted by Gary Casteel, a chiropractor. Plaintiff reported that he was experiencing pain in his upper back and buttocks one-fourth to one-half of his waking hours, that he was tolerating the pain, and that the pain had caused some diminution of his daily activities. Casteel indicated that Plaintiff's sleep was extremely limited by the condition. (R. 264). He presented again for adjustment in October 2004 reporting sharp right hip and upper back pain about one fourth to one half of his waking hours, but also reported that the condition was improving a bit. (R. 258). Casteel noted that Plaintiff's prognosis was good. (R. 259).

On September 28, 2004, Plaintiff was examined during a neurological follow-up with Dr. Burke. Plaintiff reported improvement in his leg and back pain. He was continuing to walk and was wearing the TLSO brace. (R. 344). Upon neurological examination, Plaintiff was alert and oriented times three with clear and fluent speech, cranial nerves within normal limits, 5/5 strength in the upper and lower extremities, normal and symmetric reflexes, and downward toes bilaterally.

3

(R. 345). Dr. Burke reviewed a recent x-ray suggesting adequate alignment and no further compression of the L3 and L4 fractures. Dr. Burke recommended that Plaintiff continue to wear his brace in the car but otherwise could go without and prescribed a course of physical therapy with work hardening exercises. (R. 227, 345-346).

Plaintiff was evaluated for physical therapy on October 6, 2004. Plaintiff reported that the pain radiated from the lumbar and gluteal regions down the legs to knee level with pain being worse on the right than on the left. (R. 244). Plaintiff also reported sleep disturbances and difficulty driving with pain levels at a 3-4 out of ten. *Id.* Plaintiff then continued PT for six weeks at three times a week treating with moist heat, ultrasound, range of motion and stretching, massage, myofascial release, strengthening and trunk stabilization, and work hardening activities. (R. 241-242). Plaintiff was discharged from physical therapy on November 11, 2004 with all goals met. (R. 232).

On December 30, 2004, Plaintiff was examined during a neurological follow-up with Dr. Burke. Plaintiff reported improvement in his leg pains but also noted that the pains were worse when walking on uneven surfaces and when sitting for an extended period of time. He also reported occasional numbness in his right foot. (R. 341). Upon neurological examination, Plaintiff was alert and oriented times three with clear and fluent speech, cranial nerves within normal limits, 5/5 strength in the upper and lower extremities, normal and symmetric reflexes, and downward toes bilaterally. (R. 342). Dr. Burke reviewed a recent x-ray suggesting adequate alignment and no further compression of the L3 and L4 fractures. Dr. Burke released Plaintiff for light work for a period of six weeks with a return to regular duty following that time. (R. 342-343).

4

Plaintiff was adjusted again by Gary Casteel in January 2005 for complaints of sharp right hip pain occurring about one fourth to one half of his waking hours and upper back pain occurring about one fourth of his waking hours. Plaintiff reported the back pain was not affecting his daily activities and the hip pain was improving. (R. 251). Casteel opined that Plaintiff's prognosis was good. (R. 252-253).

Plaintiff began treating with Patrick Finn, D.C., a chiropractor on April 29, 2005. (R. 325). At the time, Plaintiff reported pain at a level 7 out of 10 due to an exacerbation of his back problems stemming from a return to his old job for a period of time. (R. 322, 325). Plaintiff also reported occasional numbness in his right foot. *Id.* Finn noted his belief that Plaintiff would never reach one hundred percent again but would experience improvement in his problems. (R. 323). Plaintiff was examined again on May 6, 2005 and on May 9, 2005. (R. 317-318). On May 9th, Plaintiff reported feeling better with only mild mid-low back pain soreness/stiffness. (R. 317). This was followed by reports of stiffness and soreness with mid and low back pain on May 20, 2005 and a report of feeling a little better on May 23, 2005. (R. 313, 315). Plaintiff noted feeling stiff and sore "all over" on May 30, 2005 (R. 311).

On May 9, 2005, Plaintiff was seen for neurological follow-up with Dr. Burke. Plaintiff reported he had been working for the three weeks preceding the examination and was still experiencing "low back-pain radiating down the right lower extremity to the bottom of his right foot." (R. 336). Upon examination, Plaintiff was alert and oriented times three with cranial nerves within normal limits, 5/5 strength in the upper and lower extremities, fluent and clear speech, normal and symmetric reflexes, and downward toes bilaterally. (R. 336). Paraspinal muscle spasms were present in the lumbar region. *Id.* Dr. Burke discussed the April 2005 x-rays revealing adequate

5

alignment and no further compression L3-4 fracture. A CT scan and MRI were ordered and Plaintiff's Vicodin prescription was refilled. Plaintiff was released to light duty work with no lifting greater than 35 pounds. (R. 337).

Plaintiff continued treatment with the chiropractor through June and July of 2005 with some noted improvement in pain to a 5-6 out of 10 and increased range of motion in mid-July. (R. 286-308). He also received some massage therapy and reported in early August 2005 that his pain was much less and that his lumbar tension had subsided. (R. 285). On August 8, 2005, Finn reported that Plaintiff had made a small improvement in his subjective and objective findings and reported feeling "much better." (R. 278).

On June 9, 2005, Plaintiff had a follow-up appointment with Dr. Burke with continued complaints of low back pain, worse on the right, and radiation into his buttocks with numbness in his right foot. (R. 334). Upon neurological examination, Plaintiff was alert and oriented times three, had cranial nerves within normal limits, clear and fluent speech, 5/5 motor strength in his upper and lower extremities, normal and symmetric reflexes, and toes were down bilaterally. *Id.* Lumbar paraspinal muscle spasms and piriformis syndrome due to a tender right piriformis were noted. (R. 335, 340). A May CT scan revealed the compression fractures and moderate stenosis at L3 and L4. Physical therapy was ordered and Dr. Burke suggested Plaintiff consider epidural steroid injections. Plaintiff was released to light duty with lifting no greater than 35 pounds and no extended days. (R. 335, 338). Plaintiff underwent a second course of physical therapy starting on June 28, 2005. (R. 248). He reported similar pain but at a 7-8 out of 10. Plaintiff had fifty percent limited flexion, side-bending, extension, and rotations but normal strength and negative straight leg testing. (R. 248).

6

Plaintiff had nine visits and at discharge, the physical therapist indicated he would like to continue sessions twice a week. (R. 244).

On August 5, 2005, Patrick Finn, Plaintiff's chiropractor, completed a source statement indicating Plaintiff's ability to frequently lift and carry ten pounds, occasionally lift twenty pounds, and occasionally carry twenty to twenty-five pounds; walk four to six hours in an eight hour work day and sit for one to two hours; was limited in pushing and pulling in his lower extremities; was occasionally able to bend, kneel, stoop, crouch, balance, and climb; was limited in reaching; and his ability to move quickly was mildly inhibited. (R. 271-273). Plaintiff had further treatment with Dr. Finn from August 11, 2005 to November 17, 2005. (R. 373-404). After the first six visits, Dr. Finn completed a patient assessment indicating improvement in Plaintiff's condition with pain indicated as a 3 out of 10. (R. 397). At the next assessment in October, after several more appointments, Plaintiff reported feeling worse with a pain level at 3-8 out of 10. (R. 389). At the final assessment, Dr. Finn reported Plaintiff's "overall self health has improved currently with no tingling in the right foot, with pain scale ranging from 2-6." (R. 377).

On August 6, 2005, Plaintiff completed a daily activities questionnaire. (R. 96-105). He reported that for the first month after his injury he could not get out of bed and could not perform personal hygiene; for the first three months his wife had to cook for him and he could not drive; for the first six months putting on shoes and socks was very difficult; and for the first year he could not use his back at all and had someone cut his grass. (R. 96-97). Plaintiff indicated that after three months, he could drive for about an hour or so; after six months he could take out the trash and prepare meals; and after nine months could carry grocery bags. (R. 96-99). He reported making great progress since July 8, 2005, and was able to walk two miles and lift and carry twenty pounds.

7

(R. 98). He indicated that he still needed to stop and rest while doing anything that required prolonged periods of stooping, bending, walking, and sitting due to back pain. (R. 99). He also reported that he participated in church, movies, camping, and biking with family and friends about once a week. (R. 100). In July 2005, he went to physical therapy, a chiropractor, and to massage and felt better "than [he] had for a year." (R. 104). Plaintiff concluded by stating that he was hoping to get released for light duty by his back doctor and later added that he was released for light duty on September 5, 2006. (R. 105).

Plaintiff had a follow-up with Dr. Burke on September 7, 2005. Plaintiff reported a fifty percent decrease in his symptoms and continuing improvement and significant relief from pain starting July 8, 2005. Plaintiff described soreness in his lower back, with right side greater than left with prolonged activity, and rare pain in his foot when it was aggravated. (R. 332). Upon neurological examination, Plaintiff was alert and oriented times three, cranial nerves were within normal limits, speech was clear and fluent, 5/5 motor strength was present in upper and lower extremities, deep tendon reflexes were normal and symmetric, and toes were down bilaterally. (R. 333). Dr. Burke reviewed the MRI from May 2005, noting the compression fracture and moderate stenosis at the L3-4 level and lack of herniations. Dr. Burke released Plaintiff to light duty work with no extended hours. *Id.*

Plaintiff was examined again by Dr. Burke on October 6, 2005. Plaintiff reported his improvement as about fifty percent with continuing pain across his lower back with the right side being greater than the left and a stabbing sensation in his right SI area. He also described numbness in his right foot with aggravation through prolonged activity. Dr. Burke noted Plaintiff's return to light duty on September 6, 2005, which increased the pain level and numbness in his right foot, so

in late September Plaintiff requested to be off of work until his next appointment. Plaintiff reported that stretching, walking, and biking were helpful. (R. 428). Upon neurological examination, Plaintiff was alert and oriented times three, cranial nerves were within normal limits, speech was clear and fluent, 5/5 motor strength was present in upper and lower extremities, deep tendon reflexes were normal and symmetric, and toes were down bilaterally. Pain was present upon palpitation of the right sacroiliac joint. A review of recent x-rays revealed Plaintiff's pre-existing compression fractures causing moderate spinal stenosis. Dr. Burke suggested physical therapy and pain injections and indicated that he could not return to his cement job, but needed to contact the Office of Vocational Rehabilitation (R. 429).

Plaintiff completed a separate activities questionnaire on October 13, 2005. He reported being capable of driving two hours without pain and numbness, some light duty yard work and gardening on a small scale, and some home maintenance. (R. 143-144). He reported that after returning to work for a three week period, he could do nothing for three weeks due to soreness and pain. (R. 144). He noted that therapy worked, but he believed he could not return to his pre-injury job and would need to be retrained. (R. 151-152).

On November 14, 2005, Plaintiff underwent a consultation with Dr. John Johnson, a pain management specialist. Plaintiff reported pain occurring in the lower back region with radiation into the lower right extremity with a current pain score of 8 out of 10. Plaintiff also reported that prolonged lifting, standing, sitting, bending over, and walking intensified his pain and difficulty sleeping. (R. 407). Plaintiff's physical examination was normal except for tenderness at level L3 and L4 in the midline and right SI joint tenderness. Gait was mildly antalgic (R. 409-410). Dr. Johnson diagnosed right sacroiliitis and status post compression fracture at L3 and L4. He

9

recommended a right SI joint injection for pain. (R. 410). On November 30, 2005, Plaintiff returned to receive the injection, but left abruptly before receiving treatment when they attempted to insert an IV. (R. 406).

On January 12, 2006, Plaintiff was seen for a follow-up with Dr. Burke. Plaintiff reported soreness across his low back with radiation to his bilateral anterior thighs and down his leg to his right foot. He also reported right foot numbness. Dr. Burke noted Plaintiff's failure to undergo pain injections. (R. 426). Upon neurological examination, Plaintiff was alert and oriented times three, cranial nerves were within normal limits, speech was clear and fluent, 5/5 motor strength was present in upper and lower extremities, deep tendon reflexes were normal and symmetric, and toes were down bilaterally. Pain was present upon palpitation of the right sacroiliac joint. Dr. Burke noted that Plaintiff was symptomatic from right sacroiliac joint dysfunction and prescribed physical therapy, pain injections, and Vicodin. (R. 427).

On the same date, Plaintiff was evaluated for another course of physical therapy at CrossRoads Rehabilitation. Plaintiff complained of pain in his right SI joint into his right buttock with slight numbness in his right toes with difficulty sleeping on his right side. He further reported that he was able to do things around the house but was tolerating some discomfort when completing them and was still hunting but was not climbing trees to hunt as he had in the past. Pain was reported as 3 out of 10 all of the time and up to 9 out of 10 in the right SI joint. (R. 413). Strength and reflex testing was normal. Positive tenderness was noted in the right SI joint. (R. 414). No further records from CrossRoads were included in the record.

Beginning on January 19, 2006, Plaintiff began treating with Jodi L. Grimminger, D.C., a chiropractor. Plaintiff reported mid-back pain, blurred vision, depression, low back pain,

10

herniated disk, trouble sleeping, and joint stiffness. (R. 451). Through the remainder of January, Plaintiff presented with pain in the sacroiliac region and in the back and hip. (R. 446). In the beginning of February, Plaintiff reported severe pain in the lower back, but also reported progress on the stiffness and achiness by February 16, 2006. (R. 445). Plaintiff reported some stiffness from prolonged sitting and prolonged sitting "in bleachers" towards the end of February. Some improvement was noted in early March. (R. 444). Plaintiff reported some low back and hip pain with radiation from mid-March through the end of the month. (R. 443). Plaintiff had two appointments in April before Dr. Grimminger went on maternity leave. In early May, Plaintiff reported extreme lower back pain. (R. 442). He continued to report some degree of pain through the end of May. (R. 441). Through June, Plaintiff reported increasing pain with it being extreme at times. (R. 440).

On February 15, 2006, Plaintiff underwent a psychiatric evaluation ordered by the Office of Vocational Rehabilitation. Plaintiff reported experiencing mild depression with insomnia and some difficulty initiating activities. When given the Weschler Adult Intelligence Scale - III, Plaintiff was found to be functioning in the borderline range of intellectual functioning with a Verbal Score of 80, a Performance IQ score of 80 and a full scale IQ score of 78. On the Wide Range Achievement Test 3, Plaintiff tested at the seventh grade reading level, the sixth grade spelling level, and the eighth grade arithmetic level. (R. 432). On the Minnesota Rate of Manipulation tests, Plaintiff scored in the ninetieth percentile indicating a very good rate of manipulation for both simple and more difficult work assignments. Dr. William Frenan opined Plaintiff should avoid work positions requiring a lot of attention to detail and good inspection skills or verbal expression. Plaintiff's prognosis was listed as good and he was diagnosed with

11

adjustment disorder with depressed mood, disorder of written expression, and expressive language disorder. (R. 433-434). Dr. Fernan recommended that Plaintifff receive vocational counseling to assist him in entering an occupational or educational program. *Id*.

Plaintiff was given an eye exam on February 16, 2006 and prescribed glasses. (R.427-428). A dental examination on February 23, 2006 revealed decaying teeth that needed to be removed. (R. 435).

On August 17, 2006, Plaintiff testified at a hearing before the ALJ. Plaintiff reported returning to work as a cement worker for three weeks in September 2005, but then was taken off of work again and reported volunteering for a couple of hours vacuuming a church about once a month. (R. 493). Plaintiff reported being hurt in his lower back at L3 and L4 when the concrete forms fell on him and that he had no medical impairments pre-dating the injury. (R. 494-495). His current medications were noted as Celebrex, Vicodin, and Zanaflex. (R. 496). Plaintiff indicated a suggestion by Dr. Burke that he may need surgery and stated he was also receiving massage, chiropractic, and physical therapy treatment. (R. 497). Plaintiff testified that he was able to drive for about two hours; prepare a microwave dinner or sandwich; dust, sweep, mop, or fill a dishwasher for an hour or two; grocery shop for an hour or two; and worked in the yard about eight hours throughout the summer. (R. 498-500).

Plaintiff reported wearing a back brace with a muscle stimulator for about an hour a day. (R. 501). Plaintiff testified to watching TV about an hour a day; reading the newspaper; balancing his checkbook and paying bills; attending church service three times a month; eating at a restaurant about once a week; visiting his parents a couple of times a week; riding his bike on flat surfaces a couple of hours per week; and attending his child's functions about once a month. (R. 502-506).

Plaintiff testified that he would never horseback ride or water ski again and was having difficulty completing heavier tasks outside of his home. (R. 509-511).

With respect to recent treatment, Plaintiff explained that he had received one steroid shot and was scheduled for more, but the first had not helped. (R. 512-513). He explained that chiropractic treatment would help sometimes and a bad day would bring pain that was a 9 out of 10 and the best days would bring pain at a six out of ten. (R. 513-514). He indicated he was supposed to be on light duty when he returned to work for the three week period and was getting help with some of the heavier duties and was working at about forty percent capacity. Following this period, he noted he could not get off the couch for three weeks. (R. 515-516). He testified that he was experiencing mental impairments, but was not seeing a psychiatrist. (R. 518). He noted he no longer slept in his bed, but instead on a mattress on the floor, which only helped with sleep on occasion. (R. 519).

The ALJ proposed a hypothetical to the vocational expert whereby the individual would be limited to the light exertional level with the additional limitations of being able to stand and walk 4 hours out of an eight hour work shift and 5 hours out of a ten hour work shift; was restricted from the use of ropes, ladders, and scaffolds; and was restricted from crawling and stooping with no more than occasional crouching and postural movements and no more than occasional balancing or weighted type maneuvers. In considering any sedentary occupations, a sit, stand, and walk option, defined as taking no more than five steps away from the work station, performing a stretching maneuver and returning to the work station within one minute and doing this process no more than five times a day, was imposed. The ALJ also limited the individual to no more than occasional pushing and pulling with the lower bilateral extremities, including operation of foot

13

pedals unless the pedals required less than five pounds to actuate with anything less than five pounds being able to be performed frequently and anything more occasionally. The additional limitations of no prolonged temperature extremes, extreme wetness, or humidity or unprotected heights were also added. The individual was also limited to short, simple instructions and simple work-related decisions. (R. 523-525).

In response, the vocational expert testified that there were both light and sedentary jobs in significant numbers which the hypothetical individual could perform. The vocational expert testified that if the individual needed to miss 1-3 days monthly or be off task more than 10 percent of the time, sustained employment would not be possible. (R. 526-527). The vocational expert also testified that the sit, stand, walk option was not addressed in the Dictionary of Occupational Titles and testimony on that subject was derived from the vocational expert's professional experience and training as demonstrated in her resume. (R. 532-533).

### B.    Procedural History

Plaintiff protectively filed the instant application for DIB on July 13, 2005, alleging disability since June 30, 2004.  (R. 66-71, 87). The claim was denied. (R. 34-37). This case was then randomly selected by the Commissioner to test modifications to the disability determination process, so the reconsideration step of the administrative review process was eliminated and Plaintiff was given the opportunity to seek review of the unfavorable initial determination by an Administrative Law Judge without first seeking reconsideration. *Id.* At Plaintiff's request an administrative hearing was held on August 17, 2006 before Administrative Law Judge Douglas W.

14

Abruzzo ("ALJ"). (R. 475-541). Plaintiff, who was represented by counsel, testified at the hearing.

(R. 475-521). Irene Montgomery, a vocational expert, also testified at the hearing. (R. 521-541).

On April 16, 2007, the ALJ rendered a decision which was partially unfavorable to

Plaintiff under the five-step sequential analysis used to determine disability. (R. 13-25). The ALJ

found the following:

1.  The claimant met the disability insured status requirements of the Act on June 30, 2004, the date the claimant became unable to work, and continues to meet them through June 30, 2010.

2.  The claimant has not engaged in substantial gainful activity since June 30, 2004.

3.  The medical evidence establishes that the claimant has a severe impairment consisting of residuals of compressive fractures to the L3 and L4 vertebral bodies with associated facet degeneration and disc bulges. The claimant also has a depressive disorder, which does not have more than a de minimus effect on the claimant's ability to perform substantial gainful activity on a sustained basis and is therefore "non-severe." However, the claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.

4.  The claimant's allegations of disabling pain and limitations, when evaluated in accordance with Social Security Ruling 96-7p and Regulation 404.1529, are credible and consistent with the clinical and objective findings for the period from June 30, 2004, to September 7, 2005, but not thereafter.

5.  From June 30, 2004, to September 7, 2005, the claimant's impairment, in combination with his subjective complaints, prevented him from performing work requiring lifting or carrying more than 10 pounds frequently or 20 pounds occasionally, more than 4 hours of walking and/or standing per 8-hour workday or 5 hours of walking and/or standing per 10-hour workday, more than occasional balancing, stooping or crouching, any crawling or climbing (ladders-ropes-scaffolds), more than occasional pushing or pulling with the lower bilateral extremities, including

15

the operation of pedals which require 5 or more pounds of force to actuate, more than frequent operation of pedals which require less than 5 pounds of force to actuate, prolonged exposure to cold temperature extremes or extreme wetness or humidity, any exposure to unprotected heights, more than simple, routine tasks or simple, work-related decisions secondary to the side effects of pain medications, or an ability to complete a normal workday/work week on a regular and continuing basis due to chronic, severe pain. With regard to any sedentary occupations, the claimant also required a sit/stand/walk option, which is defined as taking no more than 5 steps from the work station, performing a stretching maneuver, and returning to the work station within 1 minute, and doing this no more than 5 times each hour. (20 C.F.R. 404.1545).

6. The claimant is unable to perform his past relevant work as a leather worker, a concrete worker and a concrete laborer.

7. The claimant was 44 years of age on June 30, 2004, his alleged onset date, and is currently 47 years of age, which is defined as a "younger individual" (20 C.F.R. 404.1563).

8. The claimant has a "high school" education (20 C.F.R. 404.1564).

9. From June 30, 2004 to September 7, 2005, the Administrative Law Judge finds the claimant was disabled, utilizing Vocational Rule 202.21, Table No. 2, Appendix 2, Subpart P, Regulation No. 4, Social Security Ruling 96-8p and vocational testimony as a framework for decision-making.

10. Since September 7, 2005, the claimant's impairment has prevented the claimant from performing work requiring lifting or carrying more than 10 pounds frequently or 20 pounds occasionally, more than 4 hours of walking and/or standing per 8-hour workday or 5 hours of walking and/or standing per 10-hour workdays, more than occasional balancing, stooping, or crouching, any crawling or climbing (ladders-ropes-scaffolds), more than occasional pushing or pulling with the lower bilateral extremities, including the operation of pedals which require 5 or more pounds of force to actuate, more than frequent operation of pedals which require less than 5 pounds of force to actuate, prolonged exposure to cold temperature extremes or extreme

wetness or humidity, any exposure to unprotected heights, or more than simple, routine tasks or simple, work-related decisions secondary to the side effects of pain medications, but his impairment has not prevented him from performing a wide range of work at the light exertional level. In addition, as to any sedentary occupations, the claimant has required a sit/stand/walk option, which is defined as taking no more than 5 steps from the work station, performing a stretching maneuver, and returning to the work station within 1 minute, and doing this no more than 5 times each hour.

11.    Since September 7, 2005, although the claimant's additional limitations have not allowed him to perform the full range of light work, utilizing Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy which he could perform. Examples of such jobs are a weigher/scales operator and a small parts assembler at the light exertional level; and an order clerk and an addresser/sorter at the sedentary exertional level. These jobs exist in significant numbers in the immediate area of the claimant's residence as well as in the national economy.

12.    The claimant was under a "disability," as defined in the Social Security Act, from June 30, 2004, to September 7, 2005, but not thereafter.

(R. 18-27).

## III.    **Legal Analysis**

### A.    **Standard of Review**

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360

(3d Cir. 1999). It consists of more than a scintilla of evidence, but less than a preponderance. *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C. § 404.1520; *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1).

This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,

> (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his

18

or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

### B.    Discussion

Plaintiff makes several arguments claiming error on the part of the ALJ. First, Plaintiff claims that the ALJ erred in his conclusion that the Plaintiff did not meet a listing in Appendix I, Subpart P, Regulation 4; specifically sections 1.04 Disorders of the Spine, 1.08 Soft Tissue Injury, and 11.08 Spinal cord or nerve root lesions. Second, Plaintiff devotes significant argument to a pair of affidavits from Plaintiff's pain specialist and chiropractor that do not appear in the record until the request for review to the Appeals Council, but were mentioned in letters to the ALJ. In short, Plaintiff argues that these affidavits should have been considered and that they indicate that Plaintiff was not capable of sustained work. Finally, Plaintiff claims the ALJ erred at Step Five in finding that significant jobs existed in the national economy which Plaintiff could perform.

The Commissioner contends that the ALJ properly assessed Plaintiff's impairments under the Listings, properly assessed Plaintiff's residual functional capacity, and correctly dealt with the affidavits of the pain management specialist and the chiropractor.

1. *The Affidavits*

Plaintiff argues that the ALJ erred in failing to consider the affidavits of Dr. John Johnson, the pain management specialist, and Dr. Grimminger, the chiropractor, which both limited the claimant to sedentary work of less than four hours per day. On August 22, 2006, Plaintiff's counsel composed a letter to the ALJ stating, "we will be providing you with additional medical records and a medical source statement by John H. Johnson, M.D., the pain management specialists presently treating Mr. Cathcart, and Jodi L. Grimminger, D.C., his treating chiropractor." (R. 185). On September 1, 2006, Plaintiff's counsel requested until September 15, 2006 to submit the affidavits. (R. 186).

On March 19, 2007, in response to a request from the Office of Disability Adjudication and Review that Plaintiff amend his claim to a closed period of June 30, 2004 and September 7, 2005, Plaintiff's attorney wrote, "[t]he affidavits that were provided by Jodi L. Grimminger, D.C. and John H. Johnson, M.D. both release Mr. Cathcart to sedentary work of less than 4 hours per day....[a]s such, we request a fully favorable decision in this matter." (R. 82). The affidavits, however, do not appear in the record until the Request for Review stage along with a letter to the Office of Adjudication and Review dated September 24, 2006 indicating the enclosure of the affidavits for use by the ALJ. (R. 467-469). The affidavits themselves indicate the signers' opinions that Plaintiff was limited to four hours of sedentary work (Dr. Johnson) or only two hours of sedentary work (Dr. Grimminger). (R. 467-468). No further analysis or documentation accompanies the affidavits.

In his opinion, the ALJ noted that the affidavits were missing from the record stating, "[t]he Administrative Law Judge notes that by letter dated March 19, 2007, claimant's counsel

asserted that affidavits had been provided by Jodi L. Grimminger, D.C. and John H. Johnson, M.D. which limited the claimant to sedentary work of less than 4 hours a day (Exhibit 6D). However, a close examination of the evidence of record shows that no such affidavits were submitted." (R. 13). Despite the affidavits being absent, the ALJ acknowledged the findings in his opinion stating:

> Nonetheless, if such affidavits were submitted, they would be given only light weight as such limitations are inconsistent with the clear and convincing weight of objective findings which show claimant has recovered sufficiently to perform work existing in significant numbers.

(R. 13). Plaintiff suggests that the ALJ erred in "failing to even consider the affidavits."

Since this evidence was not included in the initial record before the ALJ, this evidence would generally be analyzed as potential "new evidence" for the purposes of a sentence six remand under § 405 (g). Although Plaintiff does not request such a remand, this Court cannot simply overturn an ALJ's opinion based on evidence the ALJ did not have before him. New and material evidence would require a remand. However, a matter can only be remanded under this section upon a showing of "good cause" for not presenting the evidence to the ALJ. *Matthews v. Apfel,* 239 F.3d 589 (3d Cir. 2001). To warrant a remand based on "new evidence" the evidence must be 1) new and not merely cumulative of what is already in the record; 2) material, *i.e.*, relative and probative, and there is a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination; 3) the evidence must not concern a later-acquired or a subsequent deterioration of the previously non-disabling condition; and 4) there is good cause for not having included the new evidence in the record. *Szubak v. Sec'y of Health and Human Servs.,* 745 F.2d 831, 833 (3d Cir. 1984).

21

In the instant case, it is evident that the inclusion of the affidavits in the original record would not have changed the decision of the ALJ as he rejected the contents of those affidavits as they had been represented to him in Plaintiff's letters. It is evident that somewhere in the process of the affidavits reaching the Office of Disability Adjudication and Review they were either lost or misplaced, but that does not change the fact that the ALJ rejected the contents of those affidavits in his opinion. Therefore, a remand based on Plaintiff's argument that the ALJ "fail[ed] to even consider the affidavits" is not warranted.

### 2. *Opinions of Treating Physicians*

To the extent Plaintiff is arguing that the ALJ erred in giving "light weight" to the affidavits of Dr. Grimminger and Dr. Johnson and to a suggestion by Dr. Burke that Plaintiff was incapable of performing work activity, the Court will address the treating physician doctrine.

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999) (quoting *Plummer v. Apfel*, 186 F.3d at 429). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with other substantial evidence." 20 C.F.R. §§404.1527(d)(2), 416.972(d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir. 1985). There are several factors that the ALJ may consider when determining what weight to

give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927(d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §404.1527(d), 416.927(d).

With respect to non-examining sources, "[b]ecause non-examining sources do not have an examining or treating relationship with the claimant, the weight accorded to their opinions depends upon the degree to which they provide supporting explanations for their opinion." 20 C.F.R. §§ 404.1527, 416.927. To the extent the explanations are consistent with the other substantial evidence in the case, such opinions from non-treating sources are entitled to more weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). Finally, an ALJ is not bound by findings of a state agency medical or psychological consultant. 20 C.F.R. §§ 404.1527, 416.927.

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. *Stewart v. Sec'y of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

The ALJ analyzed the medical record beginning with Plaintiff's injury in September 2004 and in rejecting the opinions of his treating physicians also examined the treating relationships and Plaintiff's reported daily activities. Since Plaintiff is only challenging the ALJ's

23

opinion for the period after September 7, 2005, the Court will only review the portion of the opinion pertaining to the finding that Plaintiff was not disabled after September 7, 2005.

Beginning as early as December 2004, Dr. Burke indicated that Plaintiff could return to light duty work. (R. 333, 335, 337, 338, 342-343). He persistently found in examining Plaintiff from December 2004 to January 2006 that he was alert and oriented times three with clear and fluent speech, cranial nerves within normal limits, 5/5 strength in the upper and lower extremities, normal and symmetric reflexes, and downward toes bilaterally. (R. 333, 334, 336, 342-343). Dr. Burked noted that x-rays suggested adequate alignment and no further compression of the L3 and L4 fractures, and CT and MRI scans indicated the same fractures and also moderate stenosis. (R. 333, 335, 336, 338, 342-343, 429). On September 7, 2005, Dr. Burke again released Plaintiff for light duty work based on his findings and Plaintiff returned to his previous heavy duty job as a cement worker for a period of time. (R. 333, 493).

Although Dr. Burke continued to make the same physical findings following the September appointment, he noted after an October 2005 appointment (the letter was dated December 2005) that Plaintiff could not return to his work and needed to contact the Office of Vocational Rehabilitation. The ALJ was correct that this "appear[ed] to be temporary in nature" and to be in place only until Plaintiff could receive job training for some other type of position. (R. 20). Plaintiff, in fact, did contact the office in February 2006 and underwent a psychological evaluation for a determination of work placement. (R. 428-429, 433-435). At the conclusion of the examination, Dr. Fernan opined that Plaintiff should receive vocational counseling to assist him in entering an occupational or educational program. *Id*. In further support of this, the ALJ cited to Plaintiff's examination by Dr. Johnson, which was normal except for some back tenderness. It is

24

noted that Plaintiff was only examined by Dr. Johnson on one occasion. When he returned for a pain shot, he left the clinic before receiving it and there is no evidence that he returned. (R. 406, 410). Plaintiff had a normal examination with Dr. Burke again in January. (R. 426-427). Upon Plaintiff's continuing complaints of pain he was prescribed physical therapy and pain injections, but received no pain injections and did not pursue physical therapy past the initial consultation stage. (R. 413-414, 427).

In assigning weight to Dr. Burke's opinion, the ALJ correctly discussed the foregoing medical evidence and stated "as previously discussed, diagnostic studies have revealed no evidence of any significant neurological deficits." (R. 20). He also noted Dr. Johnson's minimal treating relationship with Plaintiff when assigning "light" weight to his opinion. (R. 18).

Dr. Grimminger treated Plaintiff for a more significant period of time, mid-January 2006 through June 2006 for complaints of pain that was severe at times. (R. 440-451). The ALJ, however, correctly noted that "a chiropractor's opinion is not 'an acceptable medical source' entitled to controlling weight." *Hartranft,* 181 F.3d at 361 (citing and quoting regulations). Generally, "[a]lthough . . . eligibility can[ ]not rest [exclusively] upon the opinion of a chiropractor, a hearing examiner can consider [his] opinion, along with all of the other evidence . . . [,] insofar as it is deemed relevant to assessing . . . disability." *Id.* at 361-62 (citation omitted). Indeed, the ALJ must exercise discretion to determine whether the acceptance or rejection of a chiropractor's findings is necessary to his issuance of a disability determination supported by substantial evidence. *See generally Mackey v. Barnhart,* 306 F.Supp.2d 337, 344 (E.D.N.Y.2004) (given chiropractors' endorsement in regulations as "an 'other source,' " his "opinions may be given *'significant weight'* under the *appropriate circumstances"* ) (citations omitted, emphasis added); *see also Walters v.*

25

*Comm'r of Soc. Sec.,* 127 F.3d 525, 530 (6th Cir.1997) ("the ALJ has the discretion to determine the appropriate weight to accord a chiropractor's opinion *based on all evidence in the record"*) (citations omitted, emphasis added).

In rejecting this evidence, the ALJ not only cited the x-rays, MRI, and CT scan as discussed above, but also Plaintiff's reports of daily activities. The ALJ noted Plaintiff's testimony that he volunteered a couple of hours a month vacuuming a church; drove for about two hours; prepared meals; dusted, swept, mopped, and did dishes; visited relatives twice a week; rode his bike; attended his child's school functions about once a month; did some yard work; took hour long walks; and paid his own bills. (R. 493-511). The ALJ was correct in noting that these activities were not consistent with an individual who was totally debilitated. In light of the medical evidence, objective testing, and Plaintiff's daily activities, the ALJ properly assigned lesser weight to the opinions of Dr. Grimminger and Dr. Johnson and that of Dr. Burke from late September 2005. It is evident that the physicians's own records and notations conflict with a finding of disability and that Plaintiff's testimony of his daily activities conflicts with the opinion of Dr. Grimminger proffered in September 2006. Therefore, the weight assigned to the opinions was supported by substantial evidence.

### 3. *Requirements of the Listings*

Plaintiff's second argument encompasses the ALJ's assessment of Plaintiff's impairments under the listings. Specifically, Plaintiff argues that he meets sections 1.04 Disorders of the Spine, 1.08 Soft Tissue Injury, and 11.08 Spinal cord or nerve root lesions. In making these arguments, Plaintiff again relies on affidavits of Dr. Johnson and Dr. Grimminger and their medical records. He also mentions the late September office visit to Dr. Burke.

26

As the Supreme Court has explained, "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Plaintiff does not make specific arguments indicating that her ailments meet all of the criteria for the above-mentioned listings. Instead, Plaintiff merely claims that the above mentioned records and affidavits support findings that Plaintiff meets all of the criteria for the listings. However, the above affidavits and records do not speak to Plaintiff meeting the specific criteria of the listings. It is Plaintiff's burden to show that he meets the criteria of the Listings. *Brown v. Bowen*, 845 F.2d 1211, 1213-14 (3d Cir. 1987) (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)). In the instant case, Plaintiff had not pointed to specific medical evidence to contradict the findings of the ALJ with regard to listings 1.04, 1.08, 11.08.

Listing 1.04 deals with disorders of the spine including herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture that results in compromise of the nerve root or the spinal cord. Appendix I, Subpart P, Regulation 4, Listing 1.04. Listing 1.04 also requires:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

27

>C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.*[1]

None of Plaintiff's medical records indicate a compromise of the nerve root or spinal cord. X-rays at the time of injury indicated that the spinal canal was not compromised (R. 351). Plaintiff's muscle strength and reflexes were persistently noted as normal. (R. 333, 334, 336, 342-343). Plaintiff never had a positive straight leg test. Spinal arachnoiditis was never diagnosed nor confirmed in any way by diagnostic testing. In addition, although MRI and CT scans noted spinal stenosis, there is not indication in the record that Plaintiff had the inability to ambulate effectively. In fact, he reported the ability to walk one or two miles and to ride his bike. (R. 98, 502-506). The ALJ noted these records in his analysis of the application of 1.04. Therefore, Plaintiff did not meet the requirements of Listing 1.04 and the finding that Plaintiff did not meet this listing was supported by substantial evidence.

Plaintiff also claims to meet Listing 1.08. Listing 1.08 deals with soft tissue injury (e.g. burns) of an upper or lower extremity, trunk, or face or head. Listing 1.08 requires that the injury

---

[1]

The inability to ambulate effectively is defined as the "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)" Appendix I, Subpart P, Regulation 4, Listing 1.04. § 1.01(b)(1).

be "under continuing surgical management, as defined in 1.00M, directed towards the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. Major function of the face and head is described in 1.00." Appendix I, Subpart P, Regulation 4, Listing 1.08.[2] Among other things, the ALJ noted that Plaintiff had not had "any surgical intervention or continuing surgical management is recommended and/or planned." (R. 15). The records shows this statement to be true and therefore, the ALJ's finding was proper.

Finally, Plaintiff asserts that he meets Listing 11.08 for spinal cord or nerve root lesions due to any cause and characterized by disorganization of motor function. Appendix I, Subpart P, Regulation 4, Listing 11.08.[3] The ALJ noted that disorganization of motor function was not present. As noted above, Plaintiff was capable of walking a significant distance, and when he reported pain in an extremity it was limited to his right leg. (R. 244, 336, 341, 344). On only one occasion was there any notation about Plaintiff's gait, and at the time, it was only noted as "mildly" antalgic. (R. 409-410). As a result, the finding that Plaintiff did not meet Listing 11.08 was supported by substantial evidence.

4. *Residual Functional Capacity and Hypothetical Question to the VE*

---

[2]

"Under continuing surgical management" as defined " refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy." Appendix I, Subpart P, Regulation 4, § 1.00M.

[3]

Disorganization of motor function is defined as "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." Appendix I, Subpart P, Regulation 4, Listing 11.08.

Plaintiff's final argument relates to the assessed residual functional capacity assigned by the ALJ and the hypothetical question posed to the vocational expert by the ALJ. Plaintiff makes three arguments: 1) the ALJ's hypothetical involving a sit, stand, and walk option resulted in opinions by the vocational expert that were based on her own personal experience in the field 2) the ALJ's hypothetical restricting Plaintiff to light work with no more than 4 hours per day of standing and walking was "inconsistent with the Dictionary of Occupational Titles for Light Work," and 3) Plaintiff reiterates his earlier argument relating to the Affidavits.

"'Residual Functional Capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Hartranft*, 181 F.3d at 359 n.1; 20 C.F.R. §§ 404.1545 (a), 416.945 (a). An ALJ making a residual functional capacity determination must "consider all evidence before him [.]" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir.2000). "That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d. Cir.2001); *see* 20 C.F.R. § 404.1545(a). In construing the evidence, the "ALJ may weigh the credibility of the evidence, [however,] he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981) (The ALJ's determination of residual functional capacity must "be accompanied by a clear and satisfactory explication of the basis on which it rests.")

In the instant determination of Plaintiff's residual functional capacity, the ALJ included a sit/stand/walk option for any sedentary positions. Plaintiff contends that the ALJ failed to analyze the vocational expert's testimony and ignored cross-examination questions which elicited

testimony that there were conflicts with the Dictionary of Occupational Titles. The thrust of the first argument deals with the vocational expert's testimony that the Dictionary of Occupational Titles does not consider a sit/stand option as a factor. The vocational expert testified that she was basing her decision on her experience rather than a set DOT formula. Plaintiff, therefore, insinuates that the vocational expert's testimony regarding the sedentary positions is somehow unreliable. The Court assumes that Plaintiff bases his argument on SSR 00-4P which requires the ALJ to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VE's or VS's and information in the Dictionary of Occupational Titles including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles."

The vocational expert testified that the sit/stand/walk option was not encompassed in the Dictionary of Occupational Titles. (R. 531-532). Therefore, contrary to Plaintiff's argument, the information and DOT in no way conflict. As a vocational expert, Ms. Montgomery was qualified based on her education, training and experience to opine about the employment market. Plaintiff never contested these qualifications. Further, SSR 00-4P does not limit a vocational expert's opinion solely to DOT. The explanation provided by Montgomery regarding the availability of the sit/stand/walk option is therefore reasonable and the ALJ did not err by relying on it.

Plaintiff's second argument separately deals with the vocational expert's testimony that there were actual conflicts between the ALJ's hypothetical for light work and the definition of light work in the Dictionary of Occupational Titles. Generally, an unexplained conflict between the VE's testimony and the DOT requires remand if substantial evidence did not exist in the record to support the ALJ's step 5 analysis. *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005); *see*

*also Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 389 (E.D.Pa. 2008); *Jones v. Barnhart*, 364 F.3d 501, 506, n.6 (3d Cir. 2004). However, where substantial evidence and explanation exists to support a step 5 conclusion, remand is unnecessary. *Id.* The step 5 determination, in the instant case, was supported by substantial evidence for two reasons: 1) the ALJ elicited testimony from the VE explaining the inconsistency and why she believed that Plaintiff was still capable of performing the jobs she listed in the "light" category despite the hypothetical not meeting the Dictionary of Occupational Titles definition for light work and 2) the VE also testified to various sedentary jobs with a sit/stand/walk option that Plaintiff would be capable of performing with the assigned hypothetical limitations, and these jobs were not inconsistent with the Dictionary of Occupational Titles.

In support of her conclusion regarding Plaintiff's ability to perform some light jobs with the additional limitation of being able to stand and walk only four hours in an eight hour workday or five hours in a ten hour work day, the VE testified in response to questions by the ALJ:

> A.   Based upon the hypothetical, I can suggest the following positions. The first would be a weigher scales operator position, DOT number example of these positions, 222.387-074. A regional estimate if these types of positions is 550; the national estimates, 87,279.

> Q.   Okay. What is your local region defined as?

> A.   Central work force investment area.

> Q.   Okay do you have any other lights?

> A.   I could also suggest a small parts assembler position, DOT number example of these types of positions is

739.687-030. A regional estimate of these types of positions is 1,215; the national estimate is 105,948.

Q.      Okay. Now let me ask you about the small parts assembler, is that going to be consistent with no more than 4 hours a day standing or walking or if it's a sitting job, to be compatible with the sit, stand, or walk?

A.      Yes, Judge, generally the job tasks are performed in a standing position, however, they could be performed seated or standing.

Q.      And then that would allow the person also – in other words, this is not like an assembly line, the person would be able to step away and stretch?

A.      That's correct Judge.

(R. 525-526).

The VE gave an adequate explanation, taking into account her professional qualifications, regarding the ability of Plaintiff to perform the small parts assembler "light" position by explaining that this position could be performed standing up or sitting down. In conjunction with the ALJ's analysis of the medical evidence and physicians' reports as discussed above, this constituted substantial evidence of Plaintiff's ability to perform this position. In any event, the VE suggested three sedentary positions that would meet the requirements of the hypothetical question and as noted, these do not conflict with the Dictionary of Occupational Titles. Therefore, the ALJ properly utilized the opinions of the VE in formulating his step 5 analysis.

Finally, to the extent Plaintiff reiterates his argument that the ALJ failed to consider the opinions of Dr. Grimminger and Dr. Johnson, the Court dealt with those arguments above. In

33

conclusion, the ALJ's opinion was supported by substantial evidence of record and will be affirmed.

**IV.     Conclusion**

Under the Social Security regulations, a federal district court reviewing the decision of the Commissioner denying benefits has three options. It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of an objective review of all evidence contained in the record, the Court finds that the ALJ's opinion was supported by substantial evidence. Therefore, the decision of the ALJ is affirmed.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MAX A. CATHCART,                                )
                                                )
                      Plaintiff,                )        3:08-cv-00266
                                                )
        v.                                      )
                                                )
MICHAEL J. ASTRUE, COMMISSIONER                 )
OF SOCIAL SECURITY,                             )
                                                )
                      Defendant.                )

## ORDER OF COURT

AND NOW, this 22nd day of March, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.    Defendant's Motion for Summary Judgment (Document No. 9) is **GRANTED.**

2.    Plaintiff's Motion for Summary Judgment (Document No. 7) is **DENIED.**

3.    The Clerk will docket this case as closed.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:      Michael J. Koehler, Esquire
         Email: attymjk@adelphia.net

         John J. Valkovci, Jr., Esquire
         Email: john.valkovci@usdoj.gov